IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **DYAN P. GUSH** | : | |
| | | **CIVIL ACTION NO.: PWG-04-1733** |
| v. | : | |
| **THE MAYOR AND CITY COUNCIL** | : | |
| **OF THE TOWN OF OCEAN CITY,** | | |
| **MARYLAND** | : | |

## MEMORANDUM AND ORDER

This is an Americans with Disabilities Act ("ADA") case in which the parties have consented to my handling all proceedings. (Paper Nos. 7, 8, 24, 25). Plaintiff Dyan P. Gush has sued the Defendant, the Mayor and City Council of the Town of Ocean City ("the City"), in a single count complaint claiming that the City violated the ADA by not rehiring her for the position of police records technician because it perceived her as being disabled with cervical cancer. (Complaint, Paper No. 1). Specifically, Ms. Gush pleaded that she had recovered fully from her illness and was able to perform the functions of her job without accommodation, but that despite this full recovery and her qualifications, the City discriminated against her by regarding her as disabled and not rehiring her based upon the perception that she remained disabled. (*Id*. at ¶ 7). The City now has filed a motion for summary judgment contending that Ms. Gush is not a "qualified individual with a disability," as statutorily defined by the ADA and therefore is not entitled to the ADA's protections.[1] (Paper No. 13). In addition, the City asserts that there is no evidence in the record demonstrating that the reason for not hiring Ms. Gush was

---

[1] The ADA prohibits covered employers from discriminating against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a).

1

because they perceived her as disabled. *Id*. The motion, having been fully briefed, and oral argument from counsel having been heard, is now ripe for resolution. (Paper Nos. 13, 14, 15). I find that under the undisputed evidentiary facts, Plaintiff's claim cannot survive summary judgment and Defendant shall be granted summary judgment.

## FACTUAL BACKGROUND

In November 1999, while living and working in New Jersey, Ms. Gush was diagnosed with cervical cancer. (Paper No. 14, Pl.'s Opp., Ex. C, Deposition of Dyan P. Gush, "Gush Depo.," at 6-8). About a month after the diagnosis, Ms. Gush underwent surgery and needed recovery time, and therefore took leave from work for approximately two months. (*Id*. at 7-8). As a result of her surgery, she understood that she was "cured" from her illness and she returned to work. (*Id*.)

In September 2000, Ms. Gush moved to Ocean City. *(Id*. at 9-10). She began working for the Ocean City Police Department on January 3, 2001 as a police records technician. (*Id*.) More than a year into her job with the City, Ms. Gush had a reoccurrence of cervical cancer. *(Id*. at 10). As part of her treatment, Ms. Gush underwent additional surgery in February 2002, followed by six weeks of chemotherapy and seven weeks of radiation. *(Id*. at 11-12). While receiving medical treatment, Ms. Gush used her short-term disability benefits, vacation time and sick leave, which ran out in August 2002. (*Id*. at 15). Ultimately, she was separated from her duties with the City effective October 1, 2002. *(Id*. at 16). Following her termination, Ms. Gush applied for and received full-time social security disability benefits, as well as disability insurance benefits from Ocean City's long-term disability carrier, FORTIS, both of which she continues to receive. *(Id.)* Despite her having been diagnosed as being terminal, Ms. Gush

continually spoke with several of her coworkers while on both short-term and long-term leave about coming back to work.

In January 2003, Ms. Gush applied for her previous position as police records technician. (Paper No. 14, Pl.'s Opp., Ex. C, Gush Depo. at 18). She was determined to be qualified for the vacant position and interviewed, and along with 17 other qualified candidates, ranked by the Ocean City Police Department interview panel. (*Id*. at 30, 36-38; Paper No. 13, Def.'s Motion, Ex. E, Affidavit of Rosemary Sample; Paper No. 23, Supplemental Affidavit of Rosemary Sample). She was ranked seventh of the seventeen candidates and was not offered her old job back. (Paper No. 13, Def.'s Motion, Ex. E, Affidavit of Rosemary Sample; Paper No. 23, Supplemental Affidavit of Rosemary Sample). Rather, another person, who was ranked number 4, was offered and accepted the position. (*Id*.) Ms. Gush alleges that the person offered the job had less experience and qualifications than she did. (Paper No. 1, Complaint at ¶¶ 7, 10; Paper No. 14, Pl.'s Opp., Ex. C., Gush Depo. at 38-40). Ms. Gush further asserts that she was the most qualified person for the job because she actually performed it, and that the reason for her not being hired was that she was "regarded as disabled" by the City. (*Id*.) Her single count complaint, filed after a timely EEOC complaint that resulted in the issuance of a right to sue letter, asserted that the City's choice was a violation of the ADA, 42 USC § 12101, et seq. (Paper No. 1, Complaint).

## **DEFENDANT'S SUMMARY JUDGMENT ARGUMENTS**

The City raises two arguments in its motion. (Paper No. 13, Def.'s Motion). First it contends that Ms. Gush's continued receipt of social security benefits and private disability insurance benefits evidences that she remains totally disabled and unable to perform the essential duties of her previous job. Therefore, it argues, she is not a "qualified individual" under the

3

ADA. Secondly, the City argues that Ms. Gush was not "regarded as" disabled or otherwise discriminated against because of a disability, but rather that the City had a legitimate, non-discriminatory explanation for her not being rehired. Specifically, the City explained that applications for the position were first reviewed to determine which applicants met the minimum qualifications for the job. Seventeen applicants, including Ms. Gush, met these requirements, and these applicants were interviewed and then ranked. Ms. Gush ranked seventh out of the seventeen candidates who were interviewed. The candidate ranked number four accepted the position after the first three highest ranked candidates declined. The City asserts that this interviewing process was a neutral, objective selection process that required the job to be offered to the highest ranked candidates in sequence.

## **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when there exists no genuine issue as to any material fact and a decision may be rendered as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party moving for summary judgment has the burden to demonstrate the absence of any genuine issue of material fact. *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). In determining whether summary judgment should be granted, the court "must assess the documentary materials submitted by the parties in the light most favorable to the nonmoving party." *Id.* (*citing Gill v. Rollins Protective Services Co.*, 773 F.2d 592, 595 (4th Cir. 1985)).

The existence of only a "scintilla of evidence," however, is not enough to defeat a motion for summary judgment. Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Anderson*, 477 U.S. at 251.

4

To be entitled to consideration on summary judgment, the facts set forth by the parties in affidavits or otherwise must be such as would be admissible in evidence. *See* Fed. R. Civ. P. 56(c); *see also Sakaria v. Trans World Airlines*, 8 F.3d 164, 171 (4th Cir. 1993) (finding that the district court properly did not consider inadmissible hearsay in an affidavit filed with motion for summary judgment); *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof in the form of admissible evidence that could carry the burden of proof in his claim at trial.").

With respect to summary judgment motions in ADA cases, the mere fact that an employer is aware of employee's impairment - without more - is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action. *Haulbrook v. Michelin North America*, 252 F.3d 696, 703 (4th Cir. 2001). And, a Plaintiff's unsupported speculation does not satisfy the burden to produce some evidence in refuting Defendant's summary judgment motion. *Estate of Hoffman v. Baltimore City Public Schools*, 173 F.3d 424 (4th Cir. 1999) (unpublished) *citing Hedberg v. Indiana Bell Tel. Co.*, 47 F.3d 928, 931-32 (7th Cir. 1995).

When evaluating evidentiary facts under Rule 56 to decide whether the motion should be granted, the Court uses the same standard used under a Rule 50 motion for Judgment as a Matter of Law: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (4th Cir. 1986); *De Leon v. St. Joseph's Hosp.*, 871 F.2d 1229, 1233 (4th Cir. 1989) "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. . . . [T]he Judge must ask himself

not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Douglas v. PHH*, 832 F.Supp. 1002, 1007-1008 (4th Cir. 1993) *citing Anderson*, 477 U.S. at 252.

## ANALYSIS

### Undisputed Material Facts

Despite Ms. Gush's continued receipt of social security and long-term disability benefits, she alleges in her Complaint that she is fully recovered from her illness and is able to perform the essential duties of her job "without accommodation," (Complaint, Paper No. 1 at ¶ 7). She testified in her deposition, however, that without her medication, which costs $4,000 per month, she remains disabled, but with the medication, she can perform the essential functions of her job without accommodation. (Paper No. 14, Pl's Opp., Ex. C, Gush Depo., at 17-18; Ex. A, Gush Affidavit at 2, ¶ 4).

The record is without any direct evidence that the City regarded Ms. Gush as being disabled in its hiring decision. Despite the lack of direct evidence, Ms. Gush testified that she believed there was "a collective group" of people who were concerned about the cost of her health benefits and regarded her as disabled, including human resources personnel such as Nettie Hastings and Roger Weseman, in addition to Sergeant Hager, one of the three people who interviewed her when she applied for her job. (Paper No. 14, Def.'s Motion, Gush Depo., Ex. C at 31-32, 41). Ms. Gush based her beliefs that she was regarded as disabled by these persons upon: (1) not being rehired for the job despite her perception that she was the most qualified, (2) her phone calls not being returned, and (3) Sergeant Hager seeming to be annoyed during the interview. (*Id.* at 31-34, 39-42). Ms. Gush's beliefs are speculation, not evidentiary fact, and do not create triable issues for summary judgment. *Hedberg v. Indiana Bell*, 47 F.3d 928, 931-32

(7th Cir. 1995) cited by *Estate of Hoffman v. Baltimore City Public Schools*, 173 F.3d 424, (4th Cir. 1999).

Ms. Gush also alleges that the City promised to give her job or a comparable one back to her upon recovery from her illness and that its failure to fulfill this alleged promise is evidence that it perceived her as disabled. (Paper No. 1, Complaint, ¶¶ 6-7, Paper No. 14, Pl.'s Opp.). Despite these allegations that the City reneged on its promise, Ms. Gush's own testimony is consistent with the testimony of her coworkers, including the Human Resources representative, Ms. Nettie Hastings, that Ms. Gush knew that her employment with the City ended at the exhaustion of her short-term disability and other leave, and that she would have to reapply for a position with the City if she became medically able to work again. (Paper No. 14, Def.'s Motion, Gush Depo., Ex. C). Although Ms. Gush's coworkers expressed sympathy and support about her illness and told her to concentrate on her recovery and coming back to work, she knew she had exhausted the City's short-term disability benefits, as well as her vacation and sick leave, and therefore that she "was separated from the Town" as of October 1, 2002. (*Id*. at 15-16). Upon her termination of employment with the City, Ms. Gush does not deny that she had an interview with Nettie Hastings in Human Resources discussing long-term disability benefits, as well as the City's policy regarding job openings and rehiring. (*Id*. at pp. 24-25).[2] As outlined in detail below, the undisputed testimony and affidavits in the record from Ms. Gush's coworkers provide additional evidence that she fully was aware of the parameters of her benefits and her employment status with the City, and there is no admissible evidence to support Ms. Gush's speculation that the City regarded her as disabled when she reapplied for her former position.

---

[2] Since October 1, 2002, based upon her doctor's letter explaining that Ms. Gush was disabled and unable to perform her job, she has been receiving long-term disability benefits from FORTIS, the City's carrier, in addition to social security benefits. (*Id*. at 16-17).

7

Ms. Nettie Hastings worked in the personnel department for the City's police department. (Paper No. 22, Hastings Depo. (Correction Suppl. to Paper No. 13)). Ms. Hastings testified in her deposition that she spoke with Ms. Gush at the beginning of her employment about insurance benefits. (*Id*. at 9). About a year after this initial discussion, Ms. Gush told Ms. Hastings that she again had been diagnosed with cervical cancer, and would need to take extended time off from work to receive medical care. (*Id*. at 9-10). Ms. Hastings explained to Ms. Gush that she was eligible for short-term disability benefits because she had worked for the City for a year. (*Id*. at 11). The short-term disability benefits would provide Ms. Gush with 100 percent of her pay for a month (or two pay periods) and then her pay would drop to 60 percent. (*Id*.) Ms. Hastings also provided Ms. Gush with the amount of time she had accrued in vacation and sick leave, which she could include in short-term extended leave. (*Id*.) Finally, Ms. Hastings discussed the Family Medical Leave Act benefits with Ms. Gush. (Paper No. 22, Hastings Depo. at 11).

In addition to the short-term disability benefits, Ms. Hastings explained the available long-term disability benefits to Ms. Gush. (*Id*. at 12-13). The long-term disability benefits, through FORTIS, required a six-month waiting period, however, the short-term benefits, through FMLA and the department's short-term coverage provided disability benefits to Ms. Gush while she waited for the long-term disability carrier's decision regarding her application for long-term disability benefits. (*Id*.) Ms. Gush does not deny that Ms. Hastings provided her with an explanation of both her short and long-term benefits. (Paper No. 14, Pl.'s Opp., Ex. C, Gush Depo. at 15-16, 25).

Before the six-month period, the City sent a letter to Ms. Gush stating her termination date upon exhaustion of her short-term disability benefits and again informed her of the

availability of the long-term benefits if she could not return to work before the six-month short-term disability period ended. (Paper No. 22, Hastings Depo. at 14). When Ms. Gush was about to exhaust her short-term leave, totaling six months, she provided the City with a doctor's note that stated that her cancer was terminal and that she was totally disabled and could not return to work to perform her duties - even light duties. (*Id*. at 14-15). As a result of the doctor's diagnosis, it was clear that Ms. Gush would not be returning to her full-time position at the end of her short-term disability benefits, thus she was advised that her separation date from employment with the department was September 30, 2002. (*Id*.) The doctor's note with its terminal diagnosis was sent to the long-term disability carrier to approve the long-term disability coverage. (*Id*. at 14).

From August through October 2002, Ms. Hastings had discussions with Ms. Gush about her benefits if she fully recovered before or after the expiration of the six-month period. (*Id*. at 15-19). Ms. Hastings explained that if she provided a medical release from her doctor before the expiration of the six-month period, she could return to her position, but that if she provided the release beyond that time, she would have to reapply for a position with the department because her employment would already be terminated. (*Id*.) Ms. Gush admits that Ms. Hastings told her she would have to reapply and that her former supervisor also told her she would have to reapply. (Paper No. 14, Pl.'s Opp., Ex. C, Gush Depo. at 24-25). When Ms. Gush ultimately did reapply for her former position, it was several months beyond her termination date and she had never provided the department with a medical release. Ms. Hastings was not involved in the process of filling Ms. Gush's former position. (Paper No. 22, Hastings Depo. at 22).

Michelle Monico is a police records technician and assistant supervisor for the City's police department's records department and one of the three panelists who interviewed Ms. Gush

9

when she reapplied for the police records technician position.  (Paper No. 14, Pl.'s Opp., Monico Depo., Ex. D at 5, 25).  Ms. Monico supervised Ms. Gush during her initial employment with the police department and testified that during that year Ms. Gush was a good employee, both reliable and knowledgeable.  (*Id*. at 8-9).  Ms. Monico assumed, without any factual basis, that a full-time employee could return to work after recovering from a disability if the employee provided a note from her doctor.  (*Id*. at 17).  She acknowledged in her deposition that this was an incorrect assumption and she was unaware of when short-term disability and other leave would be exhausted resulting in termination of employment.  (*Id*. at 16-20).  Ms. Monico eventually saw an ad in the paper for the police records technician vacancy, somehow learned that Ms. Gush would have to reapply if she wanted the position, and called Ms. Gush to make sure she knew about the job opening.  (*Id*. at 20, 23-24).

Like the other applicants who had met the minimum qualifications as determined by their applications, Ms. Gush went before an interview board, which was comprised of Ms. Monico, the current records supervisor Sergeant Hager, and Human Resources Coordinator Rosemary Sample[3].  (*Id*. at 25-26).  Ms. Monico testified that the board took turns asking each interviewee a standard set of prepared questions, and that each board member took notes.  (Paper No. 14, Pl.'s Opp., Ex. D, Monico Depo. at 28).  Ms. Monico testified that Sergeant Hager was "standoffish" during Ms. Gush's interview, but not necessarily any more standoffish than in any other interview.  (*Id*. at 30-32).  Ms. Monico also explained that Sgt. Hager had never met Ms. Gush and had not had any personal contact with her.  (*Id*.)  Based upon their individual notes, each board member separately scored the candidates, but the record does not explain how the panelists tabulated their scores to reach the ranking order.  (*Id*. at 28-32).  Ms. Monico testified

---

[3] Linda Hilliard, a police records technician filled in for Rosemary Sample during some of the interviews, but it was Ms. Sample who was part of the interview board during Ms. Gush's interview.  (*Id*. at 26, 30).

10

that she thought Ms. Gush did well in the interview, and that "she was the best-qualified person for the job based on her interview *for that day*." (*Id*. at 29, emphasis added).

Sergeant Ronald Haslam held the position of the supervisor of the police records department during several different time periods. (Paper No. 14, Pl.'s Opp., Ex. E, Haslam Depo.). Sgt. Haslam served as records supervisor from July 2001 until February 2003, and then was put on the desk to replace an officer who was going into military service. (*Id*. at 5-6). He returned to the records supervisor position on January 30, 2004. (*Id*.) During Sgt. Haslam's desk time, Sgt. Hager supervised the records department. (*Id*. at 5). During Ms. Gush's service as a police records technician, Sgt. Haslam supervised Ms. Gush (with the assistance of Michelle Monico[4]) and the Sergeant testified that Ms. Gush did a good job. (*Id*. at 7-8).

Sgt. Haslam recalled learning that Ms. Gush had cancer and was off from work on "short sick leave." (*Id*. at 8-9). He understood that Ms. Gush's length of service with the City determined the amount of "short sick leave" she was entitled to, but he did not know exactly how much "short sick leave" Ms. Gush had earned. (Paper No. 14, Pl.'s Opp., Ex. E, Haslam Depo. at 9-11). He also understood that Ms. Gush could be reinstated to her job if she provided a doctor's note and came back before her short-term sick leave ended. (*Id*. at 9-11, 13-14). During the several phone conversations that Sgt. Haslam had with Ms. Gush - whether they were before or after her short-term disability leave ended - he communicated this same understanding regarding the reinstatement policy. (*Id*.) Sgt. Haslam did not know that Ms. Gush had reapplied for her former position until he was told about her lawsuit against the City. (*Id*. at 11-12).

Ms. Rosemary Sample is the Human Resources Coordinator for the City and was also part of the interviewing team during the hiring process for the police records technician position

---

[4] Sgt. Haslam explained that Michelle Monico assisted him in his supervisory duties during the busy summer season, and therefore also supervised Ms. Gush. (*Id*. at 6). During the other less busy seasons of the year, however, when the Sgt. served as supervisor, he was the sole supervisor. (*Id*.)

11

when Ms. Gush reapplied.  (Paper No. 13, Def.'s Mtn., Ex. E, Affidavit of Rosemary Sample at 1 and Paper No. 14, Pl.'s Opp., Ex. D, Monico Depo. at 25).  In Ms. Sample's affidavit, she outlined the hiring process, which she stated, "was established well before Dyan Gush re-applied for a records technician position in February 2003, and it continues to be the procedure used by the Town of Ocean City . . . ."  (Paper No. 13, Def.'s Mtn., Ex. E, Affidavit of Rosemary Sample at 2).  The City's Human Resources department's hiring process began by reviewing applications to evaluate the candidates experience and qualifications to select which candidates met the minimum requirements and could proceed to the second step in the process, interviewing with the three-member panel.  (*Id*.)  The City selected seventeen applicants, including Ms. Gush, to be interviewed; therefore the City regarded Ms. Gush as one of the applicants that was qualified for the position.  (*Id*. and Paper No. 23, Supplemental Affidavit of Rosemary Sample at 1-2).  The three-member panel conducted the interviews by asking the same set of questions to each candidate, and then each panelist individually scored the candidates, who were then ranked based upon the tabulated scores.  (Paper No. 13, Def.'s Mtn., Ex. E, Affidavit of Rosemary Sample at 2).  The City offered the position to the candidate ranked highest, who declined, and then proceeded to extend offers in descending order until the fourth ranked candidate, Judy Schmitz, accepted the position.  (*Id*.)  Ms. Gush was ranked seventh out of seventeen.  (*Id*. and Paper No. 23, Supplemental Affidavit of Rosemary Sample at 1).

**<u>Analysis of Defendant's Arguments</u>**

The City's first summary judgment argument is not meritorious and therefore it is disposed of easily.  The law is clear under Supreme Court and Fourth Circuit precedent that evidence that an ADA claimant is receiving social security disability benefits does not estop her from pursuing her ADA claim provided that the claimant articulates a sufficient explanation of

any apparent contradiction between the two claims. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 807 (1999); *EEOC v. Stowe-Phar Mills, Inc.*, 216 F.3d 373, 378 (4th Cir. 2000); *Fox v. General Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001). "To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good belief in, the earlier statement [regarding the status of her disability], the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'" *Id.*

Ms. Gush has explained in her deposition and in her affidavit that when she is taking her medication, she is not precluded from being a "qualified individual" under the ADA because the medication ensures that she is well enough to perform the essential functions of her job without accommodation. (Paper No. 14, Ex. C, Gush Depo. at 17-18; Paper No. 14, Ex. A, Gush Affidavit). This is a colorable explanation of the apparent inconsistency between Ms. Gush receiving social security and long-term disability benefits and claiming in her lawsuit that she is not disabled. (*Id.*) Therefore, the City's first argument must fail.

Defendant's second argument has merit. The ADA states that an employer that is covered by the Act may not discriminate against a qualified individual with a disability because of the disability with regard to employment practices, including hiring practices. 42 U.S.C. § 12101 (et seq.); *Sutton v. United Airlines*, 527 U.S. 471, 476-478 (1999). A qualified person with a disability is defined at 42 U.S.C. § 12111(8) as "an individual with a disability who with or without reasonable accommodation, can perform the essential functions of the employment position at issue." Disability is defined in 42 U.S.C. § 12102(2) as, "(A) A physical or mental impairment that substantially limits one or more major life activities, (B) a record of such impairment, or (C) *being regarded as having such an impairment*." (emphasis added). The

elements of a failure to hire claim under the ADA are: (1) plaintiff is disabled as defined by the ADA, (2) plaintiff is qualified for the position at issue, and (3) the defendant's failure to hire the plaintiff constitutes unlawful discrimination based upon plaintiff's disability. *Foore v. City of Richmond*, 6 Fed. Appx. 148, 151 (4th Cir. 2001)(unpublished) *citing Tyndall v. Nat'l Education Ctrs.*, 31 F.3d 209, 212 (4th Cir. 1994); *Estate of Hoffman v. Baltimore City Public Schools*, 173 F.3d 424 (4th Cir. 1999) (unpublished).

It must be noted that despite some disagreement in the parties' memoranda, this case asserts a one count, single ADA "regarded as" claim under 42 U.S.C. § 12102(2)(C). There is no basis for a 42 U.S.C. § 12102 (2)(A) "actual disability" claim. First, Ms. Gush pleaded only a "regarded as" claim. (Paper No. 1, Complaint, ¶ 7). Secondly, Ms. Gush's sworn interrogatories clarified that she was not contending that she was in fact disabled, but only that the City regarded her as disabled. (Paper No. 14, Ex. B., Gush Interrogatories, Answer nos. 15, 19). Finally, Plaintiff has not amended her complaint to add any additional claims, and no amendment would be proper now, following the close of discovery, because of the prejudice to the City. (Paper No. 15, Def. Reply at 4, fn. 1). Regardless of the state of the pleadings, however, the record before the Court is clear that, as a matter of law, Ms. Gush cannot establish a triable issue under § 12102(2)(A). As evidenced in Plaintiff's own deposition testimony and affidavit, both of which are admissions under Federal Rule of Evidence 801(d)(2)(A), Ms. Gush may not as a matter of law assert a 42 U.S.C. § 12102(2)(A) disability claim because she has admitted that when taking her medication, she is not disabled as contemplated by the ADA, because she is able to perform essential functions of her job with medication and without accommodation. (Paper No. 14, Gush Depo., Ex. C at 18; Paper No. 14, Ex. A, Gush Affidavit at 2, ¶4). "A disability exists only where an impairment 'substantially limits' a major life activity, not where it 'might,' 'could,' or

'would' be substantially limiting if mitigating measures were not taken. A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity." *Sutton*, 527 U.S. 481-484. Therefore, persons like Ms. Gush, whose impairments are essentially "corrected" by medication, are not "disabled" within the meaning of 42 USC § 12102(2)(A). *Id*. at 485-487.

Based upon the complaint and the above undisputed evidentiary facts, the remaining issue is whether a reasonable, fair-minded jury could find in favor of Ms. Gush in her claim that the City discriminated against her because she was "regarded as" disabled. The Supreme Court and Fourth Circuit have provided clear guidance on what a plaintiff must demonstrate to withstand summary judgment in a "regarded as" ADA claim. *Id.* (defining requirements of a "regarded as" claim under the ADA and holding that plaintiffs failed to properly allege that employer regarded them as disabled within the meaning of the ADA); *Murphy v. U.P.S.*, 527 U.S. 516 (1999) (holding that plaintiff's alleged impairment did not "substantially limit" him from a major life activity and UPS did not regard him as disabled); *Rohan v. Networks Presentations*, 375 F.3d 266 (4th Cir. 2004) (concluding that plaintiff was not "disabled" under the ADA because she was not substantially limited in a major life activity and her employer did not regard her as disabled); and *Haulbrook v. Michelin North America*, 252 F.3d 696 (4th Cir. 2001) (holding that there was no evidence that the employer did not bar the plaintiff from any job and, beyond mere awareness of the plaintiff's impairment, no evidence that employer regarded him as disabled).

There are two ways in which individuals may fall within the statutory definition of being "regarded as" disabled by an employer in the hiring process under the ADA: (1) a covered entity mistakenly believes that the plaintiff has a physical impairment that substantially limits the

plaintiff from one or more major life activities, such as working, when in fact the plaintiff does not, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits the employee from one or more major life activities, such as working. *Sutton*, 527 U.S. at 489; 42 U.S.C. 12102(2)(C).  Under either circumstance, Ms. Gush must show that the City "entertain[ed] misperceptions about [her] – [the City] must believe either that [Ms. Gush] has a substantially limiting impairment that [she] does not have or that [Ms. Gush] has a substantially limiting impairment when, in fact, the impairment is not so limiting." *Sutton*, 527 U.S. at 489.  In *Sutton*, the Court noted that although the ADA does not specifically define "substantially limits," "'substantially' suggests 'considerable' or 'specified to a large degree.'" *Id*. at 491 *citing* Webster's Third New International Dictionary 2280 (1976).   "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiff[] allege [she is] unable to work in a *broad class* of jobs." *Sutton*, 527 U.S. at 491 (emphasis added).  To determine which individuals fall within the parameters of "substantially limits," the Supreme Court has adopted the EEOC's definition, which requires that the plaintiff be "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." *Id. citing* 29 C.F.R. § 1630.2(j)(3)(i) (1998); *see also* Murphy, 527 U.S. at 523 (1999) ("Thus, to be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job.").

     Here, the specific issue is:  From the undisputed material facts, could a reasonable, fair-minded jury could find that the City regarded Ms. Gush as substantially limited in her ability to

perform a broad class of jobs because it believed either that she had a substantially limiting impairment that she did not have or that she had a substantially limiting impairment when it fact it was not so limiting?

The undisputed evidence from personnel department member Nettie Hastings, records assistant supervisor Michelle Monico, records supervisor Sgt. Haslam, human resources coordinator Rosemary Sample, and Ms. Gush herself shows that no reasonable, fair-minded jury could conclude that Ms. Gush was promised that she would have her job back if she exhausted her short-term disability, her vacation leave, and her sick leave, and remained unable to come back to work.  To the contrary, the evidence shows that Ms. Gush acknowledged, and Ms. Hastings confirmed, that Ms. Gush was told that if she exhausted all the stages of short-term disability, vacation leave, and sick leave and still was not medically released to return to work, her employment would end and she would have to reapply for reappointment if she later was medically released and could return to work.

The "promises" that Ms. Gush could have "her job back" when she no longer was medically prevented from doing her job were no more than assurances that so long as she continued to be an employee using her short-term disability, vacation leave, and sick leave, she could return upon presenting a medical release.  The evidence is clear and undisputed that Ms. Hastings told Ms. Gush that she had to be terminated because she had exhausted all of her short-term benefits, was accepted by the long-term disability insurance carrier FORTIS, and had not been medically be released to return to any of her job duties.  Ms. Gush also was told and understood that after her termination date, she could reapply if she provided a medical release and the position was vacant.  Ms. Gush admitted that she was told this information and Ms. Hastings confirmed it.

Ms. Gush's speculation that the City did not rehire her because the City's officials were concerned about the cost of her medical benefits, her conclusion that she had to have been discriminated against because she had held the job before, and her own assessment that she was the most qualified for the job are inadmissible opinion statements, pursuant to Federal Rule of Civil Procedure 701. Such unsupported "speculation does not satisfy a party's burden to produce some evidence" of discriminatory intent of the City to survive summary judgment. *Hedberg*, 47 F.3d at 931-32 (cited by *Estate of Hoffman*, 173 F.3d at 424).

Moreover, when Ms. Gush did reapply, the uncontradicted evidence provided by Ms. Sample's affidavit and Ms. Monico's deposition show that Ms. Gush was not regarded as disabled and unable to perform a broad range of jobs, but just the opposite. First, like all the other applicants, Ms. Gush's application was reviewed for her experience and qualifications, and the City decided to interview her, just as they did all of the candidates who met the minimum requirements for the job. Therefore, by interviewing Ms. Gush, it clearly regarded her as qualified for the job. Secondly, the evidence shows that not only did they deem her qualified for the job from review of her application, but that after her interview they ranked her seventh out of seventeen; therefore, they deemed her relatively *more* qualified for the specific job than ten other qualified applicants, but *less* qualified than six others.

On these undisputed facts, no reasonable, fair-minded juror could find that the City regarded Ms. Gush as unqualified because of a perception that she had a disability and was unable to perform a broad range of jobs. If the City regarded her as qualified to perform her specific former job, she cannot logically have been regarded as unable to perform a broad range of jobs.

Gush presented no direct evidence of pretext and her speculation, unsupported by admissible evidence, does not establish pretext or discrimination. Therefore, there is no evidence to present on this essential element of Ms. Gush's ADA claim, and judgment must be granted as a matter of law to the Defendant, the City.

A separate order will issue.

/s/
_____
Paul W. Grimm
United States Magistrate Judge

_____
Date